# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

PAMELA JEANNE NELSON,      :
    Plaintiff,         :
                         :      No. 3:16-CV-02052 (VLB)
    v.                  :
                         :
NANCY A. BERRYHILL, *ACTING*  :      March 1, 2018
*COMMISSIONER OF SOCIAL*    :
*SECURITY*,               :
    Defendant.         :
                         :
                         :

## MEMORANDUM OF DECISION

Plaintiff Pamela Nelson ("Nelson" or "Plaintiff") challenges the Commissioner of Social Security's final decision to deny Nelson's application for disability benefits pursuant to 42 U.S.C. § 405(g). Nelson moves to reverse and remand the decision and argues Administrative Law Judge Ronald J. Thomas ("ALJ Thomas") erred in assessing Nelson's residual functional capacity ("RFC"). Defendant Nancy A. Berryhill, Acting Commissioner of Social Security ("Defendant"), moves to affirm the Commissioner's final decision. For the reasons stated below, the Court GRANTS Defendant's motion and DENIES Plaintiff's motion.

## Background

The Court has reviewed the evidence and accepts the facts from the parties' stipulation of undisputed facts, hereby incorporating them into this

1

opinion.  *See* [Dkt. 16-2 (Stipulated Statement of Facts); Dkt. 22-1 (Mot. Affirm) (Defendant's Stipulation)].  Ms. Nelson is a divorced 67-year old woman who has one estranged adult daughter and lives alone.  [R. 47-48, 173].  She has a Master's degree in Clinical Chemistry from Quinnipiac University and has worked consistently since 1978.  [R. 48-49, 178-79; Dkt. 16-2 at 1].  Ms. Nelson was last employed by Yale University as a research associate.  [R. 49].  She started in 2010 on a probationary basis but was laid off within the year on an unknown date.  [R. 49; 180].  She currently receives social security retirement and Yale University pension benefits.  [R. 48].

I.  <u>Medical History</u>

Ms. Nelson sought treatment with William Shevin, M.D., DHt. ("Dr. Shevin"), from April to December of 2011 related to issues with her thyroid, iodine, and suspected Lyme disease.  [R. 330].  At the first visit, Ms. Nelson reported a history of PTSD, abuse from her ex-husband, and sexual abuse as a child.  [R. 330-31].  Dr. Shevin observed that "[h]er manner is disorganized, emotionally volatile, some moments of excitation and some tearfulness."  [R. 331].  Ms. Nelson went to bi-monthly appointments from April through June.  [R. 319-33].  In June 2011, Ms. Nelson started to complain of mucus in her sinuses.  [R. 323].  In July and August, she switched to monthly appointments, [R. 315-318], but after August she only had one follow-up visit in December of 2011.  [R. 312-14].

At Ms. Nelson's last appointment with Dr. Shevin on December 6, 2011, she reported "pulling worms out of her nose" and stated she cleaned out her nose on an hourly basis. [R. 312]. Dr. Shevin observed she brought "nasal mucus with several irregular with cylindrical, various diameters, perhaps 2 millimeters wide, several cm long, one with a red triangle at the top which she feels is a mouth, but I cannot discern this." [R. 312]. Dr. Shevin also noted that Ms. Nelson was mildly agitated, and he stated, "She is still doggedly pursuing a course, convinced she has parasites. Maybe she does. I certainly can't be sure because of the specimen she brings in." [R. 313]. Lastly, he wrote the following: "Since I first saw her, I continue to be concerned regarding her mental stability. She has let go of her medical insurance, is probably eating up her savings, is fixated on parasites and fungus gnats with no real evidence. Note that a CBC done in March 2011 did not show any eosinophilia." [R. 313]. He referred Ms. Nelson to Thomas A. Moorcroft, D.O. ("Dr. Moorcroft"). [R. 313]. Ms. Nelson had indicated she stopped her health insurance plan because she did not trust standard laboratory tests (like those ordered by Dr. Shevin) except for the lab tests done by Dr. Moorcroft. [R. 313].

In January 2012, Ms. Nelson began treatment with Dr. Moorcroft upon Dr. Shevin's referral. [R. 348]. Ms. Nelson explained she believed she had parasites in her nose, and Dr. Moorcroft noted "patient feels these are consistent with Linguatula serrata; feels she has seen more of the life stages of this parasite

come out of her nose." [R. 348]. Her parasitology was negative, although Ms. Nelson believed there could be an inaccuracy due to her taking multiple antiparasitic herbs during that time. [R. 348]. Notwithstanding the negative results of the laboratory tests of the specimens Ms. Nelson provided, from January 2012 through April 2013, Dr. Moorcroft treated Ms. Nelson approximately once every two months to manage parasite issues and her thyroid, after which Ms. Nelson sought treatment once every three or four months through July 2015. [R. 486-518].

Ms. Nelson applied for disability insurance benefits on October 2, 2012. [R. 71]. Later that month on October 30, 2012, Dr. Moorcroft issued a letter to an unidentified recipient, indicating Ms. Nelson was a patient of his who was being treated for chronic illness. He wrote the following: "Her symptoms include muscle weakness, fatigue, poor stamina, and brain fog. Due to these symptoms, patient has a hard time sitting or standing for extended periods of time and has difficulty remembering simple instructions. I feel it unfit for her to be in a workplace setting at this time." [R. 338].

On November 20, 2012, consultative examiner Liese Franklin-Zitzkat, Psy.D. ("Dr. Franklin-Zitzkat"), administered a psychological evaluation on Ms. Nelson. [R. 369]. Dr. Franklin-Zitzkat listed Ms. Nelson's chief complaints as "systemic parasitic disease, chronic malaise/fatigue/rhinitis, nasopharynx parasitic infection, hypothyroidism, autoimmune disease, and adrenal hypofunctioning.

[R. 369]. Ms. Nelson expressed depression at a level of 8-10 out of a 10-point scale on most days and that she slept for 1-hour intervals before waking up and cleaning her nose for 2 hours. [R. 369]. Ms. Nelson reported a history of suicidal ideation without any suicide attempts and she denied a history of auditory or visual hallucinations. [R. 369]. Ms. Nelson reported that she spends most of the day cleaning her nose and that she does not go out of the house. [R. 371]. She can prepare simple meals, does not have the energy to clean, can drive, and takes large trips to the grocery store with the goal of going as infrequently as possible. [R. 371]. Ms. Nelson indicated she did not do anything for fun, although she used to enjoy gardening before she lost energy. [R. 371]. Ms. Nelson brought "a jar containing some sort of white tissue suspended in liquid so [Dr. Franklin-Zitzkat] could see what had come out of her nose." [R. 371]. The record does not reflect whether the specimen was tested to determine if it contained any medical evidence of a parasitic infection.

Dr. Franklin-Zitzkat observed that Ms. Nelson had unimpaired attention, but her short-term memory appeared slightly impaired. [R. 371]. Ms. Nelson also had difficulty concentrating throughout the interview. [R. 371]. Dr. Franklin-Zitzkat concluded Ms. Nelson had an intellectual functioning in the "average range" and that her insight and judgment appeared to be good. [R. 371]. In light of Dr. Franklin-Zitzkat's observations, she concluded the following with respect to work functioning:

> Ms. Nelson should be able to attend to and understand instructions, adapt to changes, and make routine, work-related decisions. She might have mild difficulty remembering instructions. Given her current level of distress, she could be expected to experience moderate to marked difficulty sustaining concentration as well as withstanding the stresses and pressures of a routine work day. Her level of distress could adversely impact interactions with coworkers/supervisors. Her mental health symptoms could interfere with her ability to maintain attendance. Ms. Nelson alleges physical conditions that should also be considered when assessing her capability for work functions.

[R. 371]. Dr. Franklin-Zitzkat also opined that Ms. Nelson could benefit from outpatient mental health treatment. Specifically, she stated, "If, in fact, there is no medical evidence of a parasitic infection, it is possible that her symptoms are related to complex PTSD, OCD, and/or Delusional Disorder." [R. 372]. Dr. Franklin-Zitzkat also determined Ms. Nelson was generally capable of managing her finances, although it was unlikely that choosing to discontinue health insurance was in her best financial interest. [R. 372].

In addition to the treating physicians and consultative examiners, two state agency non-treating, non-examining psychological consultants reviewed the record with respect to Ms. Nelson's RFC. The first, Adrian Brown, Ph.D. ("Dr. Brown"), evaluated Ms. Nelson's RFC on November 28, 2012, and determined she had sustained concentration and persistence limitations. [R. 79]. Despite these limitations, he concluded she was "not significantly limited" in her ability to carry out short and simple as well as detailed instructions, to sustain an ordinary routine without special supervision, to work with or near others without

distraction, and to make simple work-related decision. [R. 79]. Dr. Brown also concluded Ms. Nelson experienced moderate limitations regarding her ability to maintain attention and concentration for prolonged periods; to perform activities according to a schedule, maintain attendance, and be punctual; and to complete a normal work day and workweek at a reasonable pace without interruptions from psychological symptoms. [R. 79]. With respect to Ms. Nelson's adaptive limitations, Dr. Brown concluded she had reduced stress tolerance that would be sufficient for a routine work setting, but she could not adapt well to "abrupt, frequent, major changes in routine." [R. 80]. Dr. Brown felt Ms. Nelson was "capable of independent goal directed bx [sic] while completing routine tasks." [R. 80]. Dr. Brown acknowledged Dr. Moorcraft's descriptions of her restrictions was more limited than his, but he stated, "The opinion relies heavily on the subjective report of symptoms and limitations provided by the individual, and the totality of the evidence does not support the opinion." [R. 80]. Dr. Brown opined Dr. Moorcroft's position was "without substantial support from other evidence of record, which renders it less persuasive." [R. 80]. The second psychological consultant, Christopher Leveille, Psy.D. ("Dr. Leveille"), evaluated Ms. Nelson's RFC on reconsideration on March 7, 2013 and arrived at the same conclusions. [R. 97-98].

On May 22, 2013, Dr. Moorcroft wrote another letter regarding her treatment for chronic illness. [R. 375]. As he did in the previous letter from October 30,

2012, Dr. Moorcroft indicated Ms. Nelson's symptoms included "muscle weakness, fatigue, poor stamina, . . . and brain fog," adding that she also experienced insomnia.  [R. 375].  Dr. Moorcroft then stated the following:

> Due to these symptoms, Pamlea [sic] has a hard time sitting or standing for extended periods of time, has difficulty remembering simple instructions, as well as staying on a particular task for more than a few minutes due to fatigue and weakness.  Her anxiety also makes it difficult for her to handle every day pressures of a workplace setting.  I feel it unfit for her to be in a workplace setting at this time.

[R. 375].  Like the previous letter, there is no indication who is the intended recipient.

In June 2015, Dr. Moorcroft completed a "Medical Opinion Questionnaire: Mental Impairments Independent of Alcoholism and Drug Addiction" form on behalf of Ms. Nelson.  [R. 416].  The form contains a chart listing tasks pertaining to the "mental abilities and aptitude needed to do any job."  [R. 416-17].  Dr. Moorcroft classified Ms. Nelson's ability to "maintain socially appropriate behavior" and "adhere to basic standards of neatness and cleanliness" as "poor or none."  [R.416].  She scored either "fair" or "good" for all other tasks, except her ability to "carry out very short and simple instructions" was "unlimited or very good."  [R. 417].

## II.  ALJ Decision

Ms. Nelson applied for disability insurance benefits on October 2, 2012 with an onset date of June 11, 2012.  [R. 71].  Her claim was initially denied on

November 29, 2012 and on reconsideration on May 28, 2013. [R. 110, 116]. She thereafter requested a hearing, which was dismissed by ALJ Thomas as untimely on September 27, 2013. [R. 102]. Ms. Nelson appealed and her request for a hearing was reinstated on April 25, 2014. [R. 107-08]. ALJ Thomas then held a hearing on July 16, 2015. [R. 44]. After receiving additional evidence per the matters discussed during the hearing, ALJ Thomas rendered his decision on October 22, 2015, denying Ms. Nelson's request for disability insurance benefits. [R. 35]. ALJ Thomas's conclusions are as follows.

ALJ Thomas found that Ms. Nelson had not engaged in substantial gainful activity since her onset date of June 11, 2011. [R. 26]. He determined she suffered from the "severe impairment" of "chronic sinusitis and rhinitis, secondary to parasitic infection, thyroiditis, post-traumatic stress disorder, and adjustment disorder with depression." [R. 26]. ALJ Thomas also concluded that Ms. Nelson's "severe impairments" did not individually or collectively meet or medically equal the severity of a listed impairment under 20 C.F.R. Part 404, Subpart P, Appendix 1. [R. 26]. Ms. Nelson does not challenge any of these findings.

ALJ Thomas then determined Ms. Nelson has a RFC to perform medium work as defined under 20 C.F.R. 404.1527(c) with the exception that Ms. Nelson is limited (1) "to only occasional interaction with the public, co-workers, and supervisors" and (2) "to simple, routine, repetitive work, with one or two-step

instructions." [R. 28]. In making this evaluation, ALJ Thomas granted in relevant part "significant weight" to non-treating, non-examining psychological consultants, Dr. Brown and Dr. Leveille; "some weight" to the evaluation and opinion of consultative examiner Dr. Franklin-Zitzkat, but "little weight" to her GAF score; and "little weight" to Ms. Nelson's treating physician, Dr. Moorcroft. [R. 31-32].

ALJ Thomas also evaluated Ms. Nelson's credibility. She reported difficulty with focusing, physical weakness, nose drainage that interferes with her sleep, fatigue and malaise during the day as a result of her failure to sleep at night, and the need for nasal spray and swabs every five to 15 minutes. [R. 29]. He also noted Ms. Nelson reported she can only walk for five minutes before needing to rest for 15 minutes to one hour and that she becomes incapacitated for two weeks after attempting to complete a task. [R. 29]. ALJ Thomas considered her testimony and determined her impairments could reasonably cause the alleged symptoms but did not find "entirely credible" her statements about the intensity, persistence, and limiting effects. [R. 29]. In short, ALJ Thomas concluded there existed certain inconsistencies in the record as to Ms. Nelson's degree of symptoms and functional limitations. [R. 31]. The reasons for these opinions are: Dr. Brown's and Dr. Leveille's evaluations were "internally consistent and well supported by a reasonable explanation of the available evidence"; Dr. Franklin-Zitzkat's opinions were consistent with her findings and

Ms. Nelson's expressed symptoms but the GAF score does not necessarily relate to the claimant's ability to work; and Dr. Moorcraft "relied quite heavily on the subjective report of symptoms and limitations . . . and seemed to uncritically accept as true most, if not all, of what the claimant reported." [R. 31-32].

This appeal ensued on December 14, 2016 and was fully briefed on September 6, 2017.

## Discussion

"In reviewing a final decision of the SSA, this Court is limited to determining whether the SSA's conclusions were supported by substantial evidence in the record and were based on a correct legal standard." *Lamay v. Comm'r of Soc. Sec.*, 562 F.3d 503, 507 (2d Cir. 2009) (citing 42 U.S.C. § 405(g)). "Substantial evidence is more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* (internal quotation marks and citations omitted). "[A district court] must consider the whole record, examining the evidence from both sides, because an analysis of the substantiality of the evidence must also include that which detracts from its weight." *Petrie v. Astrue*, 412 F. App'x 401, 403–04 (2d Cir. 2011) (quoting *Williams ex rel. Williams v. Bowen*, 859 F.2d 255, 258 (2d Cir. 1988)) (internal quotation marks omitted). "Even if the Commissioner's decision is supported by substantial evidence, legal error alone can be enough to overturn

the ALJ's decision." *Ellington v. Astrue*, 641 F. Supp. 2d 322, 328 (S.D.N.Y. 2009) (citing *Johnson v. Bowen,* 817 F.2d 983, 986 (2d Cir. 1987)).

To be "disabled" under the Social Security Act, a claimant must demonstrate an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).

The SSA has promulgated the following five-step procedure to evaluate disability claims:

1. First, the [Commissioner] considers whether the claimant is currently engaged in substantial gainful activity ("Step One").

2. If she is not, the [Commissioner] next considers whether the claimant has a "severe impairment" which significantly limits her physical or mental ability to do basic work activities ("Step Two").

3. If the claimant suffers such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment which is listed in Appendix 1 of the regulations ("Step Three").

4. If the claimant does not have a listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, she has the Residual Functional Capacity ("RFC") to perform her past work ("Step Four").

5. Finally, if the claimant is unable to perform her past work, the [Commissioner] then determines whether there is other work which the claimant could perform ("Step Five").

*Rosa v. Callahan*, 168 F.3d 72, 77 (2d Cir. 1999) (citing 20 C.F.R. § 404.1520).

Ms. Nelson challenges Step Four.

A claimant's RFC is "what an individual can still do despite his or her limitations." SSR 96–8p, Policy Interpretation Ruling Titles II and XVI: Assessing Residual Functional Capacity in Initial Claims ("SSR 96–8p"), 1996 WL 374184, at *2 (S.S.A. July 2, 1996); *Melville v. Apfel*, 198 F.3d 45, 52 (2d Cir. 1999) (quoting SSR 96–8p). "Ordinarily, RFC is the individual's maximum remaining ability to do sustained work activities in an ordinary work setting on a regular and continuing basis, and the RFC assessment must include a discussion of the individual's abilities on that basis."[1] SSR 96–8p, 1996 WL 374184, at *2. "A 'regular and continuing basis' means 8 hours a day, for 5 days a week, or an equivalent work schedule." *Id.*; *Cichocki v. Astrue*, 729 F.3d 172, 176 (2d Cir. 2013) (defining RFC as "an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continued basis") (quoting SSR 96–8p, 1996 WL 374184, at *1). RFC is "an assessment based upon all of the relevant evidence . . . [which evaluates a claimant's] ability to meet certain demands of jobs, such as physical demands, mental demands, sensory requirements, and other functions." 20 C.F.R. § 220.120(a).[2]

---

[1] The determination of whether such work exists in the national economy is made without regard to: 1) "whether such work exists in the immediate area in which [the claimant] lives;" 2) "whether a specific job vacancy exists for [the claimant];" or 3) "whether [the claimant] would be hired if he applied for work." *Bowen v. Yuckert*, 482 U.S. 137, 140 (1987) (internal quotation marks omitted).

[2] An ALJ must consider both a claimant's severe impairments and non-severe impairments in determining his/her RFC. 20 C.F.R. § 416.945(a)(2); *De Leon v. Sec'y of Health & Human Servs.*, 734 F.2d 930, 937 (2d Cir. 1984).

Here, ALJ Thomas determined Ms. Nelson has an RFC to perform "medium work as defined in 20 C.F.R. § 404.1567(c) except the claimant is limited to only occasional interaction with the public, co-workers, and supervisors."  [R. 28]. ALJ Thomas also determined Ms. Nelson is "limited to simple, routine, repetitious work with one or two-step instructions."  [R. 28].

Ms. Nelson argues ALJ Thomas's RFC determination is not supported by substantial evidence.  She challenges ALJ Thomas's conclusion as to RFC on several bases: (1) the failure to consider Plaintiff's chronic sinusitis and rhinitis in determining the RFC; (2) the weight given to treating physician Dr. Moorcroft's medical opinion; (3) the incorrect analysis regarding Dr. Fitzgerald-Zitzkat's consultative examination; and (4) Ms. Nelson's credibility determination, including the failure to give any weight to her work history.  The Court will address each argument in turn.

I.  <u>Consideration of Rhinitis and Sinusitis in Determining RFC</u>

It is Ms. Nelson's position that ALJ Thomas did not consider her chronic sinusitis or rhinitis when determining her RFC.  Specifically, Ms. Nelson contends ALJ Thomas did not consider how her related symptoms would cause her to take her "away from her workstation absent the unlikely event that an employer would allow her to clean and sanitize her nose wherever she was in the workplace." [Dkt. 16-1 at 16].  Defendant challenges this position on the basis the Court explicitly referred to these diagnoses.  [Dkt. 22-1 at 14-16].

"It is the clear rule in this circuit that 'all complaints . . . must be considered together in determining . . . work capacity." *De Leon*, 734 F.2d at 937. In the RFC section of the decision, ALJ Thomas discussed Ms. Nelson's rhinitis and sinusitis diagnoses and her treatment for related symptoms. [R. 30]. ALJ Thomas summarized his findings at the end of the section:

> The claimant's fatigue related to her <u>chronic nasal symptoms</u> and thyroiditis limit her to work at the medium exertional level. Her mental impairments, including symptoms related to her physical impairments, limit the claimant to only occasional interaction with the public, co-workers, and supervisors. Moreover, her cognitive difficulties and concentration problems resulting from the <u>combination of her impairments</u> limit her to simple, routine, repetitive work, and with one or two-step instructions.

[R. 33 (emphasis added)]. The Court concludes ALJ Thomas's decision establishes he considered chronic sinusitis and rhinitis in evaluating Ms. Nelson's RFC.

The question then becomes whether Ms. Nelson has met her burden of proof to show ALJ Thomas erred in his RFC determination. *See Yuckert*, 482 U.S. at 147 n.5 ("The claimant first must bear the burden at step one of showing that he is not working, at step two that he has a medically severe impairment or combination of impairments, and at step four that the impairment prevents him from performing his past work."); *Talavera v. Astrue*, 697 F.3d 145, 151 (2d Cir. 2012) ("The applicant bears the burden of proof in the first four steps of the sequential inquiry; the Commissioner bears the burden in the last.").

"Medium work" is defined as that which "involves lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds."  20 C.F.R. § 404.1567(c).  Ms. Nelson has not pointed the Court, nor is the Court aware of, anything in the record indicating Ms. Nelson has greater physical limitations than those set forth under the "medium work" definition.

Ms. Nelson also fails to provide any evidence that shows she is limited beyond "occasional interaction with the public, co-workers, and supervisors" or that she cannot do "simple, routine, repetitive work, and with one or two-step instructions."  [R. 33].  The only evidence Ms. Nelson provides is the vocational expert's testimony about a hypothetical situation in which he opined a person who is "unable to stay on-task more than 80 percent of the time in the workplace" is unable to work.  [R. 65].  But ALJ Thomas did not determine this hypothetical applied to Ms. Nelson's situation, and Ms. Nelson does not challenge his findings at Step Five.  Without providing more evidence, the Court will not assume Plaintiff is unable to work 80 percent of the time.  Accordingly, the Court finds this argument unpersuasive.

## II.   Weight for Treating Physician: Dr. Moorcroft

Ms. Nelson challenges ALJ Thomas's determination that Dr. Moorcroft should only be afforded "little weight" with respect to her limitations and restrictions for work.  *See* [Dkt. 16-1 at 17-21].  Ms. Nelson takes issue with the fact ALJ Thomas identified her "severe impairment" as "chronic sinusitis and

rhinitis, secondary to <u>parasitic infection</u>, post-traumatic stress disorder, and adjustment disorder with depression," [Dkt. 16-1 at 19; R. 26 (emphasis added)], but then later stated, "Although she was diagnosed with and treated for a parasitic infection, there is little, if any, laboratory diagnostic testing to confirm this diagnosis." [R. 26 (internal citation omitted)]. ALJ Thomas further noted the physician relied on Ms. Nelson's reports of parasites rather than "verifiable evidence" and that "some clinicians have noted their skepticism." *Id.* ALJ Thomas then declared the RFC "gives adequate weight to the facts as determined credible." *Id.* It is Ms. Nelson's position that ALJ Thomas did not properly explain himself in affording little weight to Dr. Moorcroft, who relied largely on the impact the parasitic infection, rhinitis, and sinusitis had on Ms. Nelson's ability to work.

Defendant disagrees for the main reason that ALJ Thomas acknowledged Dr. Moorcroft was a treating physician but properly exercised his discretion to give little weight in light of conflicting evidence from consulting physicians' assessments of Ms. Nelson and other evidence in the record. [Dkt. 22-1 at 10-11].

A treating physician generally garners greater weight under the social security regulations because "these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of [the claimant's] medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings

17

alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations." 20 C.F.R. § 404.1527(c)(2). A treating physician's medical opinion "as to the nature and severity of the impairment is given 'controlling weight' so long as it 'is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record.'" *Burgess v. Astrue,* 537 F.3d 117, 128 (2d Cir. 2008) (quoting 20 C.F.R. § 404.1527(c)(2)); *see Mariani v. Colvin*, 567 F. App'x 8, 10 (2d Cir. 2014) (holding that "[a] treating physician's opinion need not be given controlling weight where it is not well-supported or is not consistent with the opinions of other medical experts" when those other opinions amount to "substantial evidence to undermine the opinion of the treating physician").

Put another way, a treating physician's medical opinion should not be given "controlling weight" when it is "contradicted by other substantial evidence in the record." *Veino v. Barnhart*, 312 F.3d 578, 588 (2d Cir. 2002); *Camille v. Colvin*, 652 F. App'x 25, 27 (2d Cir. 2016) (stating a treating physician's opinion is not given controlling weight when it conflicts with substantial evidence including "the opinions of other medical experts"). "Genuine conflicts in the medical evidence are for the Commissioner to resolve." *Id.* It is within the ALJ's discretion to "choose between properly submitted medical opinions." *Balsamo v. Chater*, 142 F.3d 755, 81 (2d Cir. 1998).

Even where an ALJ does not assign "controlling weight" to a treating physician's opinion, the ALJ must still explain the reasons not to do so and may then apply a lesser weight. *See Schisler v. Sullivan*, 3 F.3d 563, 568 (2d Cir. 1998) (requiring an ALJ to "provide a claimant reasons when rejecting a treating source's opinion"); *Camille*, 652 F. App'x at 27 (citing *Halloran v. Barnhart*, 362 F.3d 28, 32 (2d Cir. 2004)) (stating an ALJ who elects *not* to give a treating physician controlling weight must, however, "consider certain factors to determine how much weight to give it, and should articulate 'good reasons' for the weight given"); *Schrack v. Astrue*, 608 F. Supp. 2d 297, 301 (D. Conn. 2009) ("The regulations further provide that even if controlling weight is not given to the opinions of the treating physician, the ALJ may still assign some weight to those views, and must specifically explain the weight that is actually given to the opinion.") (citing *Schupp v. Barnhart*, No. Civ. 3:02CV103(WWE), 2004 WL 1660579, at *9 (D. Conn. Mar. 12, 2004)). It is "within the province of the ALJ to credit portions of a treating physician's report while declining to accept other portions of the same report, where the record contained conflicting opinions on the same medical condition." *Pavia v. Colvin*, No. 6:14-cv-06379 (MAT), 2015 WL 4644537, at *4 (W.D.N.Y. Aug. 4, 2015) (citing *Veino v. Barnhart*, 312 F.3d 578, 588 (2d Cir. 2002)). In determining the amount of weight to give to a medical opinion, the ALJ must consider the examining relationship, the treatment relationship, the length of treatment, the nature and extent of

treatment, evidence in support of the medical opinion, consistency with the record, specialty in the medical field, and any other relevant factors.  20 C.F.R. § 404.1527.

The issue here is whether Dr. Moorcroft's opinions about Ms. Nelson's functional limitations—which he rendered in October 2012, May 2013, and June 2015—should be given "controlling weight."  In October 2012 and May 2013, Dr. Moorcroft indicated in a letter that Ms. Nelson had a "hard time sitting or standing for extended periods of time and has difficulty remembering simple instructions."  [R. 338, 375].  Neither of these documents explain how or why he arrived at his conclusion; he merely indicated his conclusions were based on her symptoms: muscle weakness, fatigue, poor stamina, and brain fog (as well as insomnia for the May 2013 assessment).  [R. 338, 375].  In June 2015, Dr. Moorcroft evaluated Ms. Nelson and filled out a medical opinion chart regarding job-related tasks and her associated limitations.  [R. 416-17].  He determined she was very good at carrying out short and simple instructions, was good or fair at all other mental abilities, and was poor or could not maintain socially appropriate behavior or adhere to basic standards of neatness and cleanliness. [R. 416-17].    Dr. Moorcroft concluded Ms. Nelson would be expected to be absent from work more than twice a month.  [R. 418].  The form indicates the medical opinion chart is based on the physician's examination of the patient, but there is no indication what type of evaluations and testing were performed.

As 20 C.F.R. § 404.1527(c)(2) makes clear, a treating physician's medical opinion warrants "controlling weight" when it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques."  ALJ Thomas correctly identified Dr. Moorcroft's opinions appeared to be based solely on Ms. Nelson's self-reporting.  [R. 32].  Specifically, ALJ Thomas stated, "The doctor apparently relied quite heavily on the subjective report of symptoms and limitations provided by the claimant, and seemed to uncritically accept as true most, if not all, of what the claimant reported."  [R. 32].  Indeed, the Court has evaluated Dr. Moorcroft's notes and finds they do not indicate Ms. Nelson had any physical limitations.  *See* [R. 487, 491, 494].  Dr. Moorcroft documented Ms. Nelson's improvements and regressions regarding confusion, thinking, forgetfulness, short term memory, getting lost, depression, anxiety, and sleep; he typically did no more than indicate symptoms were "a little worse," "much worse," "a little better" or "no change" on any given visit  and often described Ms. Nelson as having "clear thought processes."  [R. 490, 493, 496, 500, 503, 507-08, 512,515, 517, 521, 524, 527, 531, 534, 541-42].  These notations are not connected to Ms. Nelson's ability to function and do not otherwise indicate the baseline at which she was compared.  The Court finds the lack of clarity about the reasons for Dr. Moorcraft's conclusions support ALJ Thomas's decision not to give Dr. Moorcraft "controlling weight"—after all, there is no indication Dr. Moorcraft relied on anything other than her self-reports.  *Burgess*, 537 F.3d at

128; *Cruz v. Sullivan*, 912 F.2d 8, 12 (2d Cir. 1990) (acknowledging a treating physician is not required to give a medical opinion supported by objective clinical or laboratory findings, but clarifying in these circumstances "the ALJ may not be required to accept it uncritically or without evaluation, particularly where the record contains substantial contrary evidence").

ALJ Thomas correctly pointed out that Dr. Moorcroft's conclusion about Ms. Nelson's limitations is largely unsupported by other medical experts who examined Ms. Nelson. [R. 32]; *see* 20 C.F.R. 404.1527(c)(2). For example, Dr. Franklin-Zitzkat, a consultative examiner, evaluated Ms. Nelson in October 2012 and reported her ability to prepare simple meals, drive, and go to the grocery store on occasion. [R. 371]. With respect to her ability to work, Dr. Franklin-Zitzkat opined, "Ms. Nelson should be able to attend to and understand instructions, adapt to changes, and make routine, work-related decisions." However, Dr. Franklin-Zitzkat also observed certain limitations:

> She might have mild difficulty sustaining concentration as well as withstanding the stresses and pressures of a routine work day. Her level of distress could adversely impact interactions with coworkers/supervisors. Her mental health symptoms could interfere with her ability to maintain attendance.

[R. 372]. Regardless, these findings do not support Dr. Moorcroft's conclusion that Ms. Nelson cannot work at all due to her limitations. Indeed, while Dr. Franklin-Zitzkat similarly recognized limitations pertaining to her concentration

and ability to work with others, she arrived at a different conclusion: that Ms. Nelson could handle a routine workday. [R. 372].

In addition to Dr. Fitzgerald-Zitzkat, Joseph B. Guarnaccia, M.D., performed a physical examination on Ms. Nelson on May 24, 2013 in connection with the Connecticut Disability Determination Services. [R. 395]. He noted "moderate pain in her lower spine," "minimal difficulty on the exam table," and that "she was able to walk easily without assistance, but favored her left leg slightly." *Id.* Although ALJ Thomas did not expressly reference Dr. Guarnaccia's findings, this evidence supports the reasonableness of a conclusion that Dr. Moorcroft's medical opinion should not be given "controlling weight" and Ms. Nelson could perform "medium work" with the limitations of "only occasional interaction with the public, co-workers, and supervisors" and "simple, routine, repetitious work, with one or two-step instructions." *See* [R. 28]; 20 C.F.R. § 404.1513a (outlining the ALJ's review of state agency materials).

Medical opinions from non-treating psychological consultants also conflict with Dr. Moorcroft's conclusions about Ms. Nelson's ability to work. The non-treating psychological consultants, Dr. Brown and Dr. Leveille, reviewed the evidence and determined Ms. Nelson could be "expected to carry out simple and repetitive tasks with necessary CPP for 2 hour periods across a normal workday and work week without special supervision." [R. 79, 97]. They also found she had reduced stress tolerance but could handle a "routine work setting"; she

could arrange for transit to work, avoid safety hazards in the work place, and respond to minor changes in work (although she could not adapt to abrupt, frequent, major changes in routine). [R. 80, 97]. These conclusions support Dr. Fitzgerald-Zitzkat's findings.

Based on these other medical experts' conclusions regarding Ms. Nelson's mental and physical abilities and limitations, the Court finds ALJ Thomas acted well within his discretion to evaluate and "choose between properly submitted medical opinions." *Balsamo*, 142 F.3d 81. This is particularly true because Dr. Moorcraft's medical opinion that Ms. Nelson cannot work does not appear to be supported by any evidence other than Ms. Nelson's self-reports. ALJ Thomas's conclusion that Ms. Nelson can perform "medium work" with specific limitations aligns with all medical experts—those who personally treated Ms. Nelson and those who assessed the record—except Dr. Moorcraft. Moreover, Dr. Moorcraft's own Medical Opinion Questionnaire indicated Ms. Nelson had "fair," "good," or "unlimited or very good" functioning on all bases except her ability to "maintain socially appropriate behavior" and "adhere to basic standards of neatness and cleanliness." [R. 416]. Dr. Moorcraft determined Ms. Nelson would have to be absent from work more than twice a month based on her limitations; a periodic absence does not mean the individual cannot work at all. [R. 418]. ALJ Thomas therefore did not err by electing not to give Dr. Moorcraft's medical opinion "controlling weight." In administering his decision,

ALJ Thomas properly explained why he did not give Dr. Moorcroft's opinion "controlling weight" with sufficient detail so as to afford "an adequate basis for meaningful judicial review." *Chicocki*, 729 F.3d at 174.

To the extent Ms. Nelson believes ALJ Thomas should have accepted Dr. Moorcroft's determination that she cannot work, this argument is unavailing. Medical opinions on certain topics are expressly reserved for the Commissioner under § 404.1527(d). Specifically, a medical opinion that a claimant is "'unable to work" does not mean that [the Commissioner] will determine that [the claimant] is disabled." 20 C.F.R. § 404.1527(d)(1). It is also the Commissioner's responsibility to determine the claimant's RFC. 20 C.F.R. § 404.1527(d)(2). Accordingly, even though Dr. Moorcroft opined that it was "unfit for [Ms. Nelson] to be in a workplace setting at this time," ALJ Thomas was required to make an independent conclusion about Ms. Nelson's ability to work. *See* [R. 338, 375]. It is also worth noting that Dr. Moorcroft's caveat, *at this time*, suggests that he felt such an inability was temporary.

## III.  Weight for Consultative Examiner: Dr. Franklin-Zitzkat

Ms. Nelson purportedly takes issue with ALJ Thomas's decision to afford Dr. Franklin-Zitzkat's medical opinion more weight than that of Dr. Moorcraft. *See* [Dkt. 16-1 at 23]. However, her arguments suggest that she disputes ALJ Thomas's consideration of only *part* of Dr. Franklin-Zitzkat's findings and seeks consideration of the evaluation in full. First, Ms. Nelson contends ALJ Thomas

did not consider Dr. Franklin-Zitzkat's conclusion that Ms. Nelson would have "moderate to marked difficulty sustaining concentration as well as withstanding the stresses and pressures of a routine work day" in determining the RFC.  [Dkt. 16-1 at 23 (quoting R. 372)].  Second, Ms. Nelson contends ALJ Thomas was required to consider and discuss Dr. Franklin-Zitzkat's comment that there existed a possibility Ms. Nelson's symptoms were related to PTSD, OCD and/or Delusional Disorder in the absence of any medical evidence of a parasitic infection.  *Id.*

Ms. Nelson's first point is unpersuasive.  In fact, ALJ Thomas did take into consideration Dr. Franklin-Zitzkat's conclusion about her "moderate to marked difficulty sustaining concentration" and withstanding work day pressures.  He expressly referenced this language and then concluded her opinions were "consistent with her findings at the examination and the claimant's reported symptoms."  *See* [R. 32 (internal citations omitted)].  ALJ Thomas ultimately afforded her evaluation and opinion "some weight."  [R. 32]; *see Selian v. Astrue*, 708 F.3d 409, 419 (2d Cir. 2013) ("We have previously cautioned that ALJs should not rely heavily on the findings of consultative physicians after a single examination.") (citing *Cruz*, 912 F.2d at 13).  Defendant argues ALJ Thomas was correct in assigning Ms. Nelson to simple, routine, and repetitive tasks despite Dr. Franklin-Zitzkat's opinion regarding "moderate to marked difficulty sustaining concentration" and withstanding workday pressures.  [Dkt. 22-1 at 9].  Namely,

Defendant points to evidence in the record indicating Ms. Nelson could manage her finances and drive a car, both activities which require sustained concentration. *See id.* at 10-11. The Court finds Ms. Nelson has not satisfied her burden to show ALJ Thomas erred in evaluating her RFC as "medium work" with limitations. *See Yuckert*, 482 U.S. at 147 n.5.

Ms. Nelson's second argument is equally unavailing. Dr. Franklin-Zitzkat opined that "[i]f, in fact, there is no medical evidence of a parasitic infection, it is possible that her symptoms are related to complex PTSD, OCD and/or Delusional Disorder. [R. 372]. The overarching principle on reviewing evidence is set forth under 20 C.F.R. § 404.1512(a): it is the ongoing responsibility of the claimant to submit all evidence relating to the individual's disability and the ALJ "will consider only impairment(s) you say you have or about which we receive evidence." 20 C.F.R. § 404.1512(a). It is true that in general an ALJ "has an affirmative obligation to develop the administrative record." *Perez v. Chater*, 77 F.3d 41, 47 (2d Cir. 1996). But this duty has limits. The ALJ must develop the claimant's "complete medical history," which is defined as "the records of [the claimant's] medical source(s) covering at least the 12 months preceding the month in which [the claimant] file[s] [the] application." 20 C.F.R. § 404.1512(b)(ii). The provision does not contemplate medical records that do not exist. The regulations expressly state that an ALJ *may* purchase a psychiatric or psychological evaluation, which means he is not required to do so. 20 C.F.R. §

404.1519k.    There is no evidence in the record that Ms. Nelson has been

diagnosed with OCD or a Delusional disorder.    Furthermore, Ms. Nelson does not

contend that she has such a diagnosis—she has not briefed this issue or

challenged ALJ Thomas's determination at Step Two.    Accordingly, the Court will

not remand on this basis.[3]

## IV.    <u>Credibility of Plaintiff</u>

Plaintiff argues ALJ Thomas committed reversible error in failing to

acknowledge her longstanding work history dating back to 1978.    [Dkt. 16-1 at

27].    Defendant responds that ALJ Thomas properly weighed her credibility in

light of the objective medical evidence despite not formally mentioning her work

history.    [Dkt. 22-1 at 18].

"When determining a claimant's RFC, the ALJ is required to take the

claimant's reports of pain and other limitations into account . . . ." *Genier v.*

*Astrue*, 606 F.3d 46, 49 (2d Cir. 2010).    However, the ALJ "is not required to

accept the claimant's subjective complaints without question; he may exercise

discretion in weighing the credibility of the claimant's testimony in light of the

other evidence in the record."    *Id.*    The ALJ's "finding that the witness is not

---

[3]    **Dr. Franklin-Zitzkat's observation was accompanied by the following observation that review of Dr. Moorcroft's records, laboratory tests subsequent to her December 2011 appointment with Dr. Shevin, and "previous mental health treatment records (e.g., from David Johnson)" would "provide further information." [R. 372]. Neither ALJ Thomas nor the parties cite any medical records associated with David Johnson, and accordingly the Court will not address this issue.**

credible must . . . be set forth with sufficient specificity to permit intelligible plenary review of the record." *Williams*, 859 F.2d at 260-61. The "ALJ's credibility determination is generally entitled to deference on appeal." *Selian*, 708 F.3d at 420.

In determining credibility, the ALJ must first determine if the claimant's asserted symptoms could "reasonably be accepted as consistent with the objective medical evidence and other evidence." 20 C.F.R. §§ 404.1529(a), 416.929(a). If the objective evidence does not support the plaintiff's testimony with respect to functional limitations and pain, the ALJ considers the factors set forth in 20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3). *Skillman v. Astrue*, No. 08-CV-6481, 2010 WL 2541279, at *6 (W.D.N.Y. June 18, 2010). The enumerated factors to be considered are (i) the claimant's daily activities; (ii) the location, duration, frequency, and intensity of the claimant's pain or other symptoms; (iii) precipitating and aggravating factors; (iv) the type, dosage, effectiveness, and side effects of any medication the claimant takes or has taken to alleviate their pain or other symptoms; (v) treatment, other than medication, the claimant receives or has received for relief of their pain or other symptoms; (vi) any measures the claimant used or has used to relieve their pain or other symptoms (e.g., lying flat on their back, standing for 15 to 20 minutes every hour, sleeping on a board, etc.); and (vii) other factors concerning the claimant's

functional limitations and restrictions due to pain or other symptoms. 20 C.F.R. § 404.1529(c)(3).

In addition, a plaintiff's good work record is one of many factors the ALJ considers in determining a claimant's credibility. *Schaal v. Apfel*, 134 F.3d 496, 502 (2d Cir. 1998); *Carvey v. Astrue*, 380 F. App'x 50, 53 (2d Cir. 2010). However, failure to consider work history is harmless error if substantial evidence supports the ALJ's credibility determination. *See Wavercak v. Astrue*, 420 F. App'x 91, 94 (2d Cir. 2011) ("That Wavercak's good work history was not specifically referenced in the ALJ's decision does not undermine the credibility assessment, given the substantial evidence supporting the ALJ's determination."); *Messina v. Astrue*, No. 09 Civ. 2509(SAS), 2009 WL 4930811, at *7 (S.D.N.Y. Dec. 21, 2009) ("While it is true that 'a good work history may be deemed probative of credibility,' failure to take account of work history does not necessarily render an ALJ's credibility assessment erroneous."); *Jackson v. Astrue*, No. 1:05-CV-01061 (NPM), 2009 WL 3764221, at * 9 (N.D.N.Y. Nov. 10, 2009) (determining the ALJ's failure to address plaintiff's long employment history to be harmless error in part because she would not have been returning to her place of work).

Although ALJ Thomas did not explicitly mention Ms. Nelson's work history, he was well aware of her lengthy period of employment. She testified about her research experience and the record establishes her annual earnings

as far back as 1968. [R. 48-51, 178]. The Court thus finds ALJ Thomas's credibility determination is not undercut by his failure to discuss her employment history in the decision. *See Wavercak*, 420 F. App'x at 94 ("To the contrary, the ALJ was well-aware of Wavercak's 17–year employment as a warehouse worker for a food distributing company, and considered this in the disability analysis when he concluded that Wavercak's RFC for light work prevented him from performing the medium demands of his past warehouse work.").

The Court also notes Plaintiff's lengthy work history holds less water than it might in other circumstances because she had been laid off in 2010 for the second time in a relatively short period of time. [R. 49]; *see generally Jackson*, 2009 WL 3764221, at * 9. Furthermore, he cited plenty of objective evidence, which the Court has discussed at length above, supporting a conclusion that Ms. Nelson's reported limitations from her symptoms are not entirely credible. Remand is therefore not warranted on this ground.

<u>Conclusion</u>

For the aforementioned reasons, the Court DENIES Plaintiff's Motion to Remand, [Dkt. 16], and GRANTS Defendant's Motion to Affirm, [Dkt. 22]. The Clerk is directed to close this case.

**IT IS SO ORDERED**

_____*/s/*_____

31

**Hon. Vanessa L. Bryant**
**United States District Judge**

**Dated at Hartford, Connecticut: March 1, 2018**